[Cite as *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 95861**

THE STATE OF OHIO,

APPELLEE,

v.

KOZLOSKY,

APPELLANT.

**JUDGMENT:**
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-529206

BEFORE: BLACKMON, P.J., ROCCO, J., and E. GALLAGHER, J.

RELEASED AND JOURNALIZED: September 22, 2011

William D. Mason, Cuyahoga County Prosecuting Attorney, and John R. Kosko, Assistant Prosecuting Attorney, for appellee.

Timothy F. Sweeney, for appellant.

PATRICIA ANN BLACKMON, Presiding Judge.

**{¶ 1}** Appellant, Carl Kozlosky, appeals his convictions and assigns ten errors for our review.[1] Having reviewed the record and pertinent law, we reverse the convictions and remand for a new trial. The apposite facts follow.

**{¶ 2}** Carl Kozlosky admitted shooting Andre Coleman in self-defense. The first trial was scheduled in March 2010. At the close of the state's questioning of its primary witness, Valerie McNaughton, the prosecutor asked her, "[D]id Carl ever express a willingness or desire to kill Andre prior to killing him?" Immediately, the defense objected; but before the judge could respond to the objection, Valerie responded, "Yeah." The court offered a curative instruction and dismissed the jury. The court then asked the defense whether it was moving for a mistrial. The defense responded in the affirmative, and the judge declared a mistrial.

**{¶ 3}** The defense later moved to dismiss the case because of double jeopardy, arguing that this case was obviously weak and that the prosecutor had goaded the defense into seeking a mistrial. The trial court denied the motion, and a second trial commenced in

---

[1]See appendix.

August 2010. The state again pursued its premise "that Kozlosky killed Andre Coleman without justification" and called several witnesses to substantiate that fact. However, the evidence showed otherwise.

Jury Trial

{¶ 4} McNaughton testified again and described her eight-year on-and-off tumultuous relationship with Coleman, which was fraught with physical abuse. About two months prior to the shooting, she began renting the upstairs of Kozlosky's home, and about a week later, she asked Kozlosky to allow Coleman to move into the house, and Kozlosky consented. However, because of the constant fights between her and Coleman, Kozlosky ultimately evicted Coleman.

{¶ 5} McNaughton testified that around 4 a.m., on September 20, 2009, Nicki, a woman she casually knew, Doug Kapel, and Coleman arrived in a red truck. Nicki invited McNaughton to party with them, and she accepted. They stopped to buy crack cocaine and proceeded to a motel, where they remained for several hours abusing drugs.

{¶ 6} McNaughton testified that after consuming all the crack cocaine they had purchased, they bought more, returned to the motel, and consumed more crack cocaine. McNaughton stated that once they had consumed all of the crack cocaine, Coleman encouraged her to make sexual advances towards Kapel in an effort to influence Kapel to buy more drugs. McNaughton refused, and Coleman became angry. As a ruse to leave the motel,

McNaughton told Coleman that she needed to meet someone who had agreed to advance her drugs.

{¶ 7} McNaughton testified that the foursome drove to the parking lot of a Save-A-Lot supermarket located near Kozlosky's home. McNaughton exited the truck while the others remained inside; she then surreptitiously slipped away and made her way back home. Once home, McNaughton told Kozlosky that she had left Coleman a few streets away, that he was very upset, and that he would be there shortly looking for her.

{¶ 8} A short time later, McNaughton observed Coleman exiting the red truck driven by Kapel, via a computer-operated security camera that monitors Kozlosky's driveway. McNaughton hysterically began yelling that Coleman had arrived and that they should lock the doors. Coleman immediately began banging on the locked back door; he kicked out the bottom panel and entered the house.

{¶ 9} McNaughton stated that Kozlosky told Coleman he was not allowed on the property, but Coleman pushed past him and came towards her in the living room. McNaughton yelled that the police had been called and that Kapel was pulling out of the driveway, which prompted Coleman to retreat and exit Kozlosky's house.

{¶ 10} McNaughton hid in the garage until Coleman left; she stayed for about 10 minutes, and reentered the house when she thought it was safe. When she entered the house, McNaughton found Coleman standing in the kitchen. Coleman immediately started yelling at McNaughton to give him money, followed her into the living room, grabbed her by the hair,

4

threw her to the ground, and began hitting her. McNaughton testified that as Coleman was beating her, Kozlosky fired two shots, hitting Coleman, who spun around and fell to the ground. McNaughton testified that Kozlosky proceeded to shoot Coleman several times as he lay on the floor.

{¶ 11} At trial, 54-year-old Kozlosky, a laid-off engineer and part-time community college professor, as well as a United States Air Force veteran, took the stand in his own defense. Kozlosky testified that in June 2009, after being laid off from his job with Sprint in 2008, he rented the upstairs unit of his house to Carolyn Walker. McNaughton occasionally visited Walker and later sought Kozlosky's permission to share the unit with Walker. Kozlosky consented, and McNaughton moved in July 2009.

{¶ 12} Walker moved out of the house at the end of July 2009, and McNaughton sought permission from Kozlosky for Coleman to move in, which he granted. From the very beginning, Coleman and McNaughton argued and fought constantly, with Coleman violently beating McNaughton, especially when he was coming down from a crack-cocaine high. Kozlosky testified that by the end of August 2009, the fighting between Coleman and McNaughton had become so frequent and disruptive to himself and his neighbors that he had ordered him to leave his house. Kozlosky escorted Coleman off his property and told him not to return. But Coleman was uncooperative. A loud argument ensued, and neighbors summoned the police. Coleman eventually left, and Kozlosky was cited for disorderly

conduct. Kozlosky wore a leather pocket holster with a gun. He had a concealed carry permit; however, the police took the weapon and told him he could pick it up the next week.

{¶ 13} After Coleman's departure, McNaughton warned him about Coleman's violent past. McNaughton showed Kozlosky information on Cuyahoga County's website regarding Coleman's 1990 conviction for shooting a man to death, a conviction for carrying a concealed weapon, and numerous drug-related offenses.

{¶ 14} Kozlosky testified that on September 20, 2009, Coleman, despite protests, entered his house three separate times. First, Coleman began banging on the locked door shortly after McNaughton had arrived home. Kozlosky and McNaughton shouted that Coleman was not allowed inside, but he ignored them, kicked out the bottom panel of the door, and crawled through into the kitchen. Coleman finally left when McNaughton told him that the police had been called.

{¶ 15} While Kozlosky was repairing the door that Coleman had kicked in, Coleman returned. Kozlosky demanded that he leave, but Coleman brushed passed him, asked if Kozlosky wanted to "shoot it out," and proceeded to search for McNaughton. While Kozlosky was in the house, Coleman held one hand behind his back signaling that he had a gun. Coleman left after his attempts to locate McNaughton proved unsuccessful.

{¶ 16} Coleman returned a third time while Kozlosky was still repairing the broken door. Again, Kozlosky demanded that Coleman leave, at which time McNaughton entered the house. Coleman immediately grabbed McNaughton by her hair and began beating her.

Kozlosky protested, as McNaughton yelled for help. Kozlosky demanded that Coleman stop the assault, but when Coleman reached behind his back for his gun, Kozlosky pulled his revolver and shot Coleman. Kozlosky testified that when he shot Coleman, Coleman spun around, fell to the ground, and began to twitch, a scenario that prompted Kozlosky to fire several more times.

{¶ 17} Kozlosky described his thoughts at the moment of the shooting: "I thought I was dead. I thought, I was panicking, I thought it just about, I thought he was going to shoot me. My gun was brand new, I never tried it. I didn't even know if it would work. I was afraid it would fail me and he was going to shoot me. I was pretty much panicking at the time." Kozlosky maintained, "I thought he was going to shoot me."

{¶ 18} The jury found Kozlosky guilty of murder and the attached one- and three-year firearm specifications. The trial court sentenced Kozlosky to a prison term of 15 years to life for the murder conviction and three years for the firearm specifications. Kozlosky now appeals.

Manifest Weight of Evidence

{¶ 19} We begin our analysis with the tenth assigned error, which we find dispositive of the instant appeal. Kozlosky argues that his convictions are against the manifest weight of the evidence. We agree.

7

**{¶ 20}** In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest-weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

**{¶ 21}** Kozlosky argues that the jury lost its way in convicting him of murder. Specifically, he argues that he was acting in self-defense when he shot and killed Coleman.

**{¶ 22}** Self-defense is an affirmative defense that, if proved, relieves a defendant of criminal liability for the force that the defendant used. " 'The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused.' " *State v. Suarez*, 2d Dist. No. 10CA0008, 2011-Ohio-1438, ¶ 10, quoting R.C. 2901.05(A).

**{¶ 23}** The accused must show each of three elements in order to establish self-defense: (1) the accused was not at fault in creating the situation; (2) the accused had a bona fide belief that he or she was in imminent danger of death or great bodily harm and that the only means of escape was the use of force; (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Clellan*, 10th Dist. No. 09AP-1043, 2010-Ohio-3841. See also *State v. Melchior* (1978), 56 Ohio St.2d 15, 20-21, 381 N.E.2d 195; *State v. Ward*, 168 Ohio App.3d 701, 2006-Ohio-4847, 861 N.E.2d 823, ¶ 30; *State v. Ludt*, 180 Ohio App.3d 672, 2009-Ohio-416, 906 N.E.2d 1182,¶ 21.

**{¶ 24}** R.C. 2901.09(B) codifies a form of self-defense known as the "Castle Doctrine" and provides:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

**{¶ 25}** This statute creates a rebuttable presumption, and the burden to prove that the charged individual was not acting in self-defense falls on the state. See Senate Bill 184 ("S.B. 184"). "Under the Castle Doctrine [S.B. 184], a person is presumed to have acted in self-defense when attempting to expel or expelling another from [his] home who is unlawfully present. Further, under the Castle Doctrine, a person attempting to expel or expelling another is allowed to use deadly force or force great enough to cause serious bodily

9

harm. There is also no duty to retreat inside one's home anymore." *State v. Johnson*, Cuyahoga App. No. 92310, 2010-Ohio-145, ¶ 18.

{¶ 26} In the instant case, nothing in the record indicates that Kozlosky was at fault in creating the incident that led to Coleman's death. To the contrary, at trial, the evidence unequivocally established that Coleman, who had previously been evicted from the residence, was unlawfully in the house on the day he was shot and killed by Kozlosky.

{¶ 27} It is undisputed that Coleman entered Kozlosky's home three times without permission and against protestations and that he ignored all demands to leave. In his first unlawful entry, Coleman kicked out the bottom panel of the back door, crawled through, and, with impunity, remained in the house until McNaughton yelled that the police had been summoned. Coleman returned a second time within minutes after going next door to search for McNaughton. He then menacingly searched throughout the house for McNaughton, despite Kozlosky's repeated demands that he leave.

{¶ 28} In his third unlawful entry, Coleman immediately attacked McNaughton and began beating her. Kozlosky testified:

Q. What happens next?

A. She yelled out to me, yelled out my name. So I say "Stop that, you can't be doing that." He turns to her, looks over at me and he goes to pull his gun out from behind his back. When he does that, as soon as his arms starts to move, I draw my gun and hold it. I watched his hand come out from behind his back. As soon as I see he had something in it, I begin to fire and pulled the trigger as fast as I can.

Q. How many times did you shoot, do you remember?

10

A.     I can't remember, but I - - I looked down at my gun to make sure it was pointing in this direction. * * * He turned like this until his back was facing me. When I saw that, that's when I stopped.  Then he fell forward like that, with his feet out here and his head between the two couches.


Q.     After you fired the shots, at some point, what did you do?

A.     After I fired and he fell, I walked over to see if he was moving or if I hit him.  I tried to see if he was moving or if I hit him.  I tried to see if I had actually hit him or if I missed or what * * *.

Q.     At some point, what did you do after you were looking over him?

A.     Well I am looking over close.  I did have my gun there pointing, holding it right next to him just to make sure, in case I just grazed him or he's about to jump back up at me.  I saw movement and I panicked and pulled the trigger again, and I don't know if the gun actually went off or if I had shot all the rounds already or if I did fire again.

* * *

Q.     Now, Mr. Kozlosky, what is going through your mind at the time in which this is occurring?

A.     I thought I was dead, I thought, I was panicking, I thought it just about, I thought he was going to shoot me.  My gun was brand new, I never tried it.  I didn't even know if it would work.  I was afraid it would fail me and he was going to shoot me.  I was pretty much panicking at the time.

{¶ 29} Here, Kozlosky's testimony establishes that he had a bona fide belief that he was in imminent danger of death or great bodily harm at the hands of Coleman and that the only means of escape was the use of force.  Kozlosky had recently learned from McNaughton that Coleman had killed a man in 1990 and had been convicted of carrying a concealed weapon, and he had personally observed Coleman's violent behavior towards McNaughton.

11

Given this knowledge and Coleman's actions of unlawfully entering the house three separate times that day, as well as Coleman's statement about "shooting it out," Kozlosky's belief that he was in imminent danger was well founded.

{¶ 30} Finally, under the Castle Doctrine, Kozlosky had no duty to retreat inside his own home. *Johnson*, 2010-Ohio-145. Therefore, we find that Kozlosky has established all three elements of the affirmative defense of self-defense, and the Castle Doctrine fully applies to the facts of the instant case. We also find that the jury appeared confused about the jury instruction, as evidenced by questions regarding the definition of "unlawful entry" and "Castle Doctrine." Further, the jurors queried whether the Castle Doctrine applied to both self-defense of the owner of the home and anyone in the home.

{¶ 31} Finally, the record indicates that two of the jurors did independent research on the Castle Doctrine and discussed it with the other jurors. We conclude that the jury lost its way in the instant case, and Kozlosky's convictions are against the manifest weight of the evidence. Accordingly, we sustain the tenth assigned error and reverse his convictions. We reluctantly remand the matter for a new trial because we are restrained by the standard of review under the manifest weight of the evidence and cannot discharge Kozlosky. *Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541. *Tibbs,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶ 32} Our disposition of the tenth assigned error renders the remaining errors moot. See App.R. 12(A)(1)(c).

12

Judgment reversed

and cause remanded.

_____

ROCCO and GALLAGHER, JJ., concur.

_____

APPENDIX

Assignments of Error

"I. Because the prosecutor in the first trial intended to provoke the defendant into moving for a mistrial, the trial court erred in denying Kozlosky's pretrial motion to dismiss the indictment as barred by the double jeopardy clauses in the State and Federal Constitutions."

"II. Kozlosky was denied due process of law when the trial court failed to properly instruct the jury on the affirmative defense of self-defense as applicable to a shooting that occurs in the defendant's own home against a victim claimed by defendant to be an intruder in the home."

"III. Kozlosky was denied due process of law and a fair trial when the trial court failed to instruct the jury on the affirmative defense of 'defense of another' and failed to include 'defense of another' within its instruction on the castle doctrine."

"IV. Kozlosky was denied due process of law and a fair trial when the trial court erroneously instructed the jury that Kozlosky had a duty to retreat in his own home."

"V. Kozlosky was denied due process of law and a fair trial when the trial court failed to affirmatively instruct the jury that Coleman's entry into Kozlosky's home was, for all purposes relevant to the affirmative defense of under R.C. 2901.05(B), unlawful and without privilege to do so."

"VI. The trial court erred in denying the defendant's motion for judgment of acquittal made at the conclusion of all the evidence because the evidence

13

established the affirmative defense of self-defense and/or defense of another by a preponderance of the evidence and the presumption of self-defense was never rebutted by the state."

"VII. The misconduct of two jurors during deliberation in conducting their own research concerning the castle doctrine, and sharing their findings with the rest of the jury, required that the court declare a mistrial, and the court's failure to do so was prejudicial error which denied Kozlosky a fair trial before an impartial jury."

"VIII.  When the jury reported its inability to reach a verdict after many hours of deliberation over two days, the jury was deadlocked and the court should have declared a mistrial at that time.  The court's failure to do so, and to instead give the jury a Howard Charge, was prejudicial error that denied Kozlosky his rights to a fair trial before an impartial and uncoerced jury."

"IX. The trial court erred in denying Kozlosky's post-trial motions for a new trial and for judgment of acquittal."

"X.  Kozlosky's convictions are against the manifest weight of the evidence."