[Cite as *State v. Wilson*, 2012-Ohio-1952.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97350**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# SAMUEL WILSON

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-549075

**BEFORE:** Sweeney, P.J., Rocco, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** May 3, 2012

**ATTORNEY FOR APPELLANT**

Britta M. Barthol, Esq.
P.O. Box 218
Northfield, Ohio 44067

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Matthew Waters, Esq.
     Katherine Mullin, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, P.J.:

{¶1} Defendant-appellant Samuel Wilson ("defendant") appeals his conviction for attempted murder following a bench trial. Defendant contends that his conviction was based on insufficient evidence. He also asserts that his conviction was against the weight of the evidence on the alleged basis that he acted in self-defense. For the reasons that follow, we affirm.

{¶2} According to the record, defendant operated an auto repair business out of his residence in Cleveland, Ohio. Defendant started this home business because he had difficulty walking for various reasons, including injuries and obesity.[1] Defendant was able to operate his business with the aid of a few workers.

{¶3} Defendant met Jason Andrews ("Andrews") a few years ago when Andrews was working for a cable television company. Andrews testified that he was responsible for collecting past due cable payments, or in lieu thereof, shutting off the cable service on the delinquent accounts. However, for his own personal gain, Andrews would sometimes illegally reconnect the cable services for a fee. Andrews said he did this for defendant but defendant denied it.

{¶4} Defendant began working on Andrews's cars and Andrews also referred customers to defendant. The two men developed a friendship. When Andrews left the employ of the cable company he asked defendant for work. Andrews began working at defendant's home business around January or February of 2011.

---

[1] The record reflects that defendant used a walker and a wheelchair but could also sometimes walk without assistance.

{¶5} Several other men worked for defendant in addition to Andrews, including George Huggins ("Huggins") and Rushid Wright ("Wright").[2] Huggins lived with defendant and was familiar with Andrews.

{¶6} Defendant designated Andrews as the "key master" which meant he was responsible for locking up the tools and equipment at the end of each business day.

{¶7} Andrews worked for defendant for less than a month and during this time some of defendant's tools were stolen. Defendant testified that he lost about $4,500.00 worth of equipment. Defendant suspected that Andrews took it; possibly with Huggins as an accomplice. For this reason, defendant withheld approximately $100.00 that he owed to Andrews for work that was done. Andrews denied stealing the equipment and was angry about being shorted on his pay. Andrews continued to demand payment from defendant.

{¶8} Andrews went to defendant's house on one occasion after being terminated and let himself in. Andrews found Huggins in the kitchen and spoke to him about the money. At that time, defendant was asleep and Andrews did not wake him. This is the day an air compressor was stolen from defendant's house.

{¶9} Huggins said he did not think there was anything wrong with Andrews entering the house on that day even though he had already been fired. Huggins even offered Andrews food and a beverage. Huggins believed Andrews stole the air compressor.

---

[2] Wright was hired after Andrews was terminated and the two men never worked together.

**{¶10}** Later, Andrews spoke with Huggins on the phone about wanting his money from defendant. According to Huggins, Andrews threatened to "bring the fire" if defendant did not pay him. Huggins relayed the message to defendant. Defendant testified that he believed Andrews was threatening him through Huggins.

**{¶11}** Andrews's testimony also acknowledged that defendant appeared to believe Andrews had threatened him. Andrews denied it. Andrews alleged that what he had actually told Huggins was that he was "fired up" in reference to being owed money. Andrews told police that he told Huggins there would be problems if defendant did not pay him. The officer considered that statement to be a threat.

**{¶12}** Defendant testified that he heard a pounding on his door on April 5, 2011. He either saw Andrews or believed Andrews was outside trying to break in. Defendant called the police and reported it.

**{¶13}** Before noon on April 6, 2011, Wright was outside of defendant's residence working on his truck. He saw Andrews approach and told him defendant was inside of the house.

**{¶14}** There was conflicting testimony concerning whether Andrews broke into the house on April 6, 2011, as reflected in the testimony of defendant, Wright and Andrews.

**{¶15}** By all accounts, the door locks were damaged and defendant would secure the door with a bar. However, some of the workers, including Andrews, knew how to open the door if the bar was in a "secondary" position. Wright could not recall if the back door of the house was open or barred shut when Andrews went inside. Defendant testified the

bar was in the secondary location on April 6, 2011 because Wright needed to be able to get in and out of the house and defendant felt unable to move around that day. Andrews testified that the two back doors were open and that he even knocked on the second door before entering defendant's kitchen.

{¶16} Defendant was in the kitchen cooking when he heard someone entering and believed it was Wright. Defendant gave various accounts of the ensuing events — one to police on April 6, 2011 and another at trial.

{¶17} Defendant had a gun on his person, which he said he began carrying in fear of Andrews. On April 6, defendant reported that Andrews was angry and lunged at him with a knife. When he saw the knife, defendant fired a shot at defendant. The bullet struck Andrews in the stomach and he fell to the ground. A few minutes later Andrews came at defendant again and was shot in the head. Defendant crawled out of the back door and called 9-1-1, and during this time, he observed Andrews go out of an upstairs window and drive off in a car. Defendant told the 9-1-1 operator that Andrews was heading towards E. 55th Street and that Andrews lived on Dibble. Defendant also told the 9-1-1 operator that he had left the gun in the house.

{¶18} At trial, defendant recalled things a bit differently. When Andrews entered the house he moved defendant's walker and grabbed defendant's shoulder. Defendant said he was paralyzed in fear and tasted blood as his vision began to blur. At first, defendant believed Andrews was reaching for a knife but then was certain he saw the outline of a gun in Andrews's pants. As Andrews reached in his pants, defendant shot him. Although defendant was aiming for Andrews's leg, the bullet hit his stomach. When

Andrews expressed disbelief at being shot, defendant responded "what do you expect me to do, to sit here and not be prepared and you have been threatening me all week and you strong arm me and stole all my stuff?"

{¶19}     Defendant asked Andrews for his phone but set it on the counter because he did not know how to use it.   Andrews grabbed defendant's leg and defendant shot the gun again trying to get free of Andrews's hold. The second bullet hit Andrews in the head but did not penetrate his skull. Defendant went into his bedroom to get his phone and went outside and called 9-1-1.   Defendant said he had the gun in his hand during the 9-1-1 call but later put it back in the house. Defendant left Andrews inside on the floor. Andrews escaped through an upstairs window and drove off.

{¶20}     Defendant estimated the entire incident lasted a few minutes.

{¶21}     Andrews said he went to defendant's house on April 6, 2011 in an effort to collect his money. He entered through an open door and knocked before entering the kitchen. He began arguing with defendant about the money and the stolen property. He denied ever threatening defendant but admitted that he was mad. According to Andrews, defendant shot him in the stomach for no reason at all. Defendant then sat in the kitchen for a half an hour as defendant was bleeding and asking defendant to call an ambulance. Defendant spoke to someone on the phone but Andrews did not think it was an ambulance service.

{¶22}     Defendant took Andrews's phone and Andrews recalls that it kept ringing. Andrews told defendant not to move or he would kill him. Andrews said he did not want to die in defendant's house and attempted to leave. At that point, defendant was blocking

his exit and shot him in the head. Then, defendant instructed Wright to watch Andrews and defendant went outside. Andrews begged Wright not to be an accomplice or "co-defendant." Somehow Andrews was able to crawl upstairs where he threw a VCR through a window and climbed out. Andrews hang dropped from the gutter off of the second floor. Andrews fled the scene in one of defendant's vehicles. He sought help and was taken to the hospital where he remained in recovery for three days.

{¶23} Andrews confirmed that defendant could have killed him a couple of times during the ordeal but he did not. Andrews's medical records indicate that he tested positive for opiates in his system. Andrews admitted to using marijuana but denied any other drug abuse. Andrews also testified that he did not have a weapon on April 6, 2011.

{¶24} Shortly after Andrews left, police arrived on the scene and found Andrews's cell phone in defendant's front yard. Andrews believed defendant planted it there. A blood trail found in defendant's house corroborated Andrews's testimony about his exit path.

{¶25} Defendant's gun was inside of the house. Defendant was outside and breathing heavily. Officers interviewed both defendant and Andrews.

{¶26} Wright's testimony was fraught with inconsistencies and the trial court indicated on the record that Wright had "significant memory problems." In summary, he recalled hearing gunshots on two separate occasions, which prompted him to briefly peek inside of defendant's house. Each time, he observed Andrews laying on the kitchen floor but chose not to get involved. The first time, Wright resumed working on his truck outside and the second time he was intent on leaving what he considered to be a dangerous

situation. He estimated the gunshots were approximately five minutes apart. Wright had heard defendant and Andrews arguing inside of the house.

**{¶27}** Huggins testified that he was not present at the house during the shooting on April 6, 2011. Defendant called him and said he had shot Andrews, which Huggins thought was a joke and hung up. Defendant called back and told Huggins he was being arrested.

**{¶28}** Defendant was charged with attempted murder and two counts of felonious assault with firearm and forfeiture specifications.

**{¶29}** Following the bench trial, the court found defendant guilty on all counts and specifications. At sentencing, the trial court determined that defendant's convictions were allied offenses and all were merged into the attempted murder count. The court imposed an eight year aggregate sentence comprised of a three year term for the gun specification consecutive to a five year prison term for attempted murder.

**{¶30}** Defendant appeals assigning two errors for our review.

**{¶31}** "Assignment of Error I: The evidence was insufficient as a matter of law to support a finding beyond a reasonable doubt that Appellant was guilty of attempted murder."

**{¶32}** When reviewing sufficiency of the evidence, an appellate court must determine, "after viewing the evidence in a light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).

**{¶33}** In order to withstand the defendant's Crim.R. 29 motion as to the attempted murder charge, the record must contain some evidence that would prove beyond a reasonable doubt that defendant violated R.C. 2923.02(A) and R.C. 2903.02(A) which respectively provide:

> No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense.

> No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

**{¶34}** Defendant asserts that the evidence fails to prove he purposely attempted to cause Andrews's death.

> A jury may find intent to kill where the natural and probable consequences of a defendant's act is to produce death, and the jury may conclude from all the surrounding circumstances that a defendant had a specific intention to kill.

*State v. Brown*, 8th Dist. No. 92814, 2010-Ohio-661, ¶ 52.

**{¶35}** Defendant admitted that he intentionally fired two gunshots at Andrews but claims that his actions were justified on the basis of self-defense. Whether the court erred by convicting defendant in light of his asserted claim of self-defense requires an analysis under the manifest weight of the evidence standard, which is addressed in connection with defendant's next assignment of error. *State v. Dykas*, 85 Ohio App.3d 763, 2010-Ohio-359, 925 N.E.2d 685, ¶18 (8th Dist.); *see also*, *State v. Kozlosky*, 195 Ohio App.3d 343, 2011-Ohio-4814, 959 N.E.2d 1097, ¶ 31 (8th Dist.).

**{¶36}** We note that defendant is not challenging the court's verdict which found him guilty of two counts of felonious assault, apparently recognizing that there was

sufficient evidence to support those convictions. Whether defendant's purpose was to kill rather than injure Andrews was a disputed fact; either of which conclusion would have been supported by this record. However, if the surrounding circumstances and testimony are viewed in a light most favorable to the state, a rationale trier of fact could conclude that defendant intended to kill Andrews. For example, Andrews said that as he lay bleeding on the kitchen floor from the first gunshot wound, defendant told Andrews he would kill him if he moved. When Andrews attempted to leave the house, defendant, in fact, shot him in the head. Clearly defendant disputed this version of events, however, that was a matter of credibility for the trier of fact to resolve. The first assignment of error is overruled.

{¶37} "Assignment of Error II: Appellant's convictions for attempted murder and felonious assault were against the manifest weight of the evidence when Appellant proved by a preponderance of the evidence that he acted in self-defense."

{¶38} To warrant reversal of a verdict under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997).

{¶39} Defendant contends his convictions were against the manifest weight of the evidence because he believes that the evidence supports his claim of self-defense.

> [W]hen reviewing a claim by a defendant that evidence supports his claim of self-defense, the manifest-weight standard is the proper standard of review because a defendant claiming self-defense does not seek to negate an element of the offense charged but rather seeks to relieve himself from culpability.

*Dykas*, 2010-Ohio-359, ¶18 (citations omitted).

**{¶40}** Generally, the defendant bears the burden of proving this affirmative defense by presenting a preponderance of the evidence on the following elements: 1) he was not at fault in creating the situation; 2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and 3) he did not violate any duty to avoid the danger. *Kozlosky*, 2011-Ohio-4814, ¶ 23.

**{¶41}** However, R.C. 2901.09(B) codifies a form of self-defense known as the "Castle Doctrine" and provides:

> For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

**{¶42}** This court has noted that "this statute creates a rebuttable presumption, and the burden to prove that the charged individual was not acting in self-defense falls on the state." *Id*. at ¶ 25. In accordance with *State v. Johnson*, 8th Dist. No. 92310, 2010-Ohio-145, ¶ 25:

> Under the Castle Doctrine, a person is presumed to have acted in self-defense when attempting to expel or expelling another from his home who is unlawfully present. Further, under the Castle Doctrine, a person attempting to expel or expelling another is allowed to use deadly force or force great enough to cause serious bodily harm. There is also no duty to retreat inside one's

home anymore.

**{¶43}** We agree with defendant's argument that the Castle Doctrine applies in this case. However, the state did present evidence to rebut the presumption that defendant was acting in self-defense. Simply put, if defendant's version of events was believed, his actions in shooting Andrews were justified but if Andrews's testimony was deemed more credible, then they were not.

**{¶44}** In this case, we have a scenario where not just one, but two gunshots were fired at the victim with at least five minutes passing between them. Additionally, defendant was not alone on his property when this happened. Wright was outside working on his vehicle and periodically looked inside the house to see Andrews bleeding on the kitchen floor. Defendant was aware of Wright's presence but did not enlist his help until after he had already shot Andrews twice. Defendant took Andrews's phone but did not use it and then shot Andrews again before retrieving his own phone from the bedroom. Then, defendant allegedly went right past Andrews (who he believed to be armed with a gun or knife) and left the house with Andrews still inside. If Andrews had a weapon, he never used it but chose instead to crawl, while bleeding from the head and stomach, up the stairs and out of a second-story window. Based on this record evidence, we cannot say that the trial court clearly lost its way when it found that the state had rebutted the presumption that defendant acted in self-defense. This assignment of error is overruled.

**{¶45}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

JAMES J. SWEENEY, PRESIDING JUDGE

KENNETH A. ROCCO, J., and
MARY EILEEN KILBANE, J., CONCUR