[Cite as *State v. Martin*, 2017-Ohio-7431.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27220 |
| | : | |
| v. | : | T.C. NO. 16-CR-977 |
| | : | |
| MICHAEL J. MARTIN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the ____1st___ day of _____September_____, 2017.

. . . . . . . . . . .

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

MICHAEL MILLS, Atty. Reg. No. 0092133, 371 W. First Street, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Michael J. Martin was found guilty in the Montgomery County Court of Common Pleas of two counts of murder and several other offenses. He was sentenced

to an aggregate term of 30 years to life in prison. He appeals from his conviction.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

*Procedural History*

{¶ 3} On April 6, 2016, Martin was indicted on two counts of felony murder, four counts of felonious assault, and one count of discharging a firearm at or near a prohibited premises (over a public road); each of these counts included a firearm specification and a specification for discharging a firearm from a motor vehicle. Martin was also charged with improper handling of a firearm in a motor vehicle and having weapons under disability. The counts of murder and two of the counts of felonious assault related to the shooting of Gary Lamar Tisdale, Jr.; the two additional counts of felonious assault related to Elbert Soles and Ellis McMillin.

{¶ 4} Martin waived his right to a jury on the count of having weapons under disability. In June 2016, he was tried by a jury on all other counts. Martin was found guilty of two counts of murder, two counts of felonious assault (related to Tisdale), and discharging a firearm at or near a prohibited premises, along with both specifications for each of these counts, and of improper handling of a firearm. The jury found him not guilty of the two additional counts of felonious assault. The court found Martin guilty of having weapons under disability.

{¶ 5} The two counts of murder and the two counts of felonious assault related to Tisdale were merged for sentencing, and Martin was sentenced to a mandatory term of 15 years to life. The specifications also merged, and Martin was sentenced to three years on the firearm specification and to five years on the specification for discharging a firearm from a motor vehicle. The count of improper handling of a firearm was merged

with discharge of a firearm at or near a prohibited premises, and Martin was sentenced to 12 months on this offense, along with a three-year firearm specification. Martin was sentenced to 36 months for having weapons under disability. All of the sentences and specifications were to run consecutively. Additionally, Martin was ordered to pay restitution in the amount of $7,870.93 and court costs.

{¶ 6} Martin appeals from his conviction, raising three assignments of error. We will address these arguments in an order that facilitates our discussion.

### *The Weight of the Evidence*

{¶ 7} In his third assignment of error, Martin contends that his conviction was against the manifest weight of the evidence.

{¶ 8} An argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson,* 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; s*ee Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 9} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of

particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 10} The State's evidence was as follows:

{¶ 11} On the evening of March 26, 2016, after spending some time at their aunt's house in Kettering, Gary Lamar Tisdale and his brother, Elbert Soles, set out in Tisdale's Charger to purchase some "weed" from an acquaintance of Tisdale's named "Bama" (Ellis McMillin) However, McMillin did not have what Tisdale and Soles wanted. McMillin got in the car with Tisdale and Soles to find someone from whom they could make a purchase, which they did.

{¶ 12} Sometime after 9:00 p.m., when Tisdale, Soles, and McMillin were driving around together, they drove past a car in which Lisa Busbee was sitting. Busbee and Tisdale had been in a romantic relationship in the past, and the car in which she sat was parked in front of a house at which Busbee was staying. Busbee was sitting in the passenger's seat of the parked car, and Martin was in the driver's seat. After passing the car and recognizing Busbee, Tisdale did a U-turn and pulled up alongside the car in which Busbee was seated. The cars were then facing in the same direction.

{¶ 13} Tisdale got out of his car and approached Busbee, walking around the back end of the vehicles. According to the testimony of Soles, McMillin, and Busbee, Tisdale was in a "happy" mood, was not behaving in a threatening or aggressive manner, and did not have a gun. These witnesses also testified that Tisdale's car was not parked

so closely to Martin's as to prevent Martin from exiting. Tisdale spoke with Martin and/or Busbee through the sun roof of the car, which was open, while standing on the curb; the windows were closed.

{¶ 14} According to Soles, Tisdale said to Martin, "You can't stay away from my girl." According to McMillin, Tisdale asked Busbee why she was "calling him over there if she's in the car with someone else." According to Busbee, Martin already had a gun in his lap when Tisdale approached the car and spoke to him. Similarly, Soles testified that he did not see Martin reach for a gun after they pulled alongside the car.

{¶ 15} Without warning, Martin pointed his gun at Tisdale through the sun roof and fired. Tisdale was shot in the chest, but he managed to return to his car and to pull away in the car with Soles and McMillin. It was not immediately clear to Soles (who was in the front passenger seat) whether Tisdale was hit, but Soles saw a "flash from behind" and yelled "he's chasing us." Tisdale "hit the gas," but almost immediately started driving erratically and lost control of the car. Soles told Tisdale to stop the car as it approached a busy intersection, but Tisdale did not respond. Soles tried to control the vehicle, without success. A few blocks from Busbee's residence, the vehicle crashed into a tree across the street from a fire station, and the airbags deployed.

{¶ 16} Soles jumped out of the car, ran to the driver's side, partially pulled his brother from the car, and checked for breathing. Soles testified that Tisdale was still breathing but could not talk. Firefighters quickly responded from across the street; they detected no pulse but started CPR. Having observed no signs of life, the fire department did not transport Tisdale to a hospital.

{¶ 17} After receiving 911 calls and responding to the scene of the crash, police

officers began to investigate the shooting. They interviewed Soles and McMillin and sought to determine the location of the shooting. At the scene of the crash, officers observed that Tisdale's car had lost a tire and that no guns or ammunition were found on Tisdale's body. Between the scene of the crash and the approximate location of the shooting, officers found one spent shell casing in the street and a freshly damaged curb. Busbee approached an officer who was collecting evidence in the street near the shooting and provided more specific information about where and how events had transpired. That police officer found a broken cell phone near the curb where Martin's car would have been parked at the time of the shooting.

{¶ 18} A short time later, Martin called the police and offered to surrender. Several police officers responded to his home, where he was taken into custody. A handgun was found on the passenger seat of Martin's vehicle, and there was a hole in the passenger side of the front windshield of his car.

{¶ 19} Busbee, age 27, testified that she had known Martin since she was a teenager; they had been neighbors, and they also had a sexual relationship when she was 18. Busbee testified that she had no romantic relationship with Martin in March 2016, but that Tisdale and Martin had "had words" in the past. However, according to Busbee, she saw Martin every morning and every night in early 2016. He provided her with cigarettes and orange juice when they saw each other and, on the night in question, he was also going to give her some money to go to laser tag for her daughter's birthday, which was that day.

{¶ 20} According to Busbee, Martin and Busbee were parked in front of her cousin's house (where she was staying) smoking a "blunt" (marijuana), when Tisdale

approached. Busbee testified that Martin removed the gun from his glove box and locked the car doors while Tisdale was making the U-turn, and that Martin did not load the gun in her presence at that time. She also testified that Martin was talking on the phone, telling someone that he did not want to come to a club because he did not want "to shoot nobody."

{¶ 21} Busbee testified that, when Tisdale approached the car, Tisdale said "You still trying to f*** my b****."[1] According to Busbee, Tisdale used a regular voice, and his tone was not angry, aggressive, or threatening. She also testified that Tisdale did not try to get in through the sun roof or try to reach for Martin through the roof; Tisdale did try to open her door, but it was locked, and she had not unlocked it because she "didn't want drama." Busbee said Tisdale did not have a gun in either hand when he was standing outside the car.

{¶ 22} Busbee testified that Martin's "gun just went off" almost immediately after Tisdale's statement. Busbee stated that Martin had held the gun up above the sun roof. In the immediate aftermath of the shooting, Busbee did not know if Tisdale had been hurt or where he had gone, although she saw his car drive away. She was "scared" and ran into her cousin's house, taking some of her children with her from the porch. She heard a second shot when she was on her porch trying to get into the house.

{¶ 23} McMillin testified that he remained in the back seat of Tisdale's car while Tisdale approached Busbee in Martin's car. McMillin testified that the gunshot happened without warning, that the conversation had been in normal tones prior to that time, and

---

[1]Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

that Tisdale had not tried to get into Martin's car. McMillin further stated that, after the shot was fired, Tisdale walked back to his car "like nothing," and it was not immediately apparent that he had been shot. McMillin doubted that Tisdale even realized right away that he had been shot. McMillin testified that, as they drove away, he (McMillin) dropped to the floorboard of the car because two additional shots were fired. When the shots ended and McMillin sat back up, he noticed that Tisdale had "lumped down in the seat" and realized that Tisdale had been shot. Soles and McMillin then tried to control the car and to get Tisdale's foot off the gas pedal as they careened down the street and through a busy intersection, striking a pole and a tree.

{¶ 24} McMillin testified that Tisdale did not have a gun on the day of the shooting and that Tisdale "never carried a gun." McMillin also was not armed at the time of the shooting. McMillin was not able to identify Martin as the shooter from his observations at the time of the shooting; he had not paid attention to Martin before the shooting, and did not have an opportunity to observe him afterward.

{¶ 25} Busbee testified that, when she heard about the car crash and saw police officers nearby, she went to talk with police officers who were at Second and Kilmer streets, near her cousin's house and the scene of the shooting. Police Officer Angela Woody testified that she was approached by Busbee as she investigated the shooting. Woody stated that Busbee was very upset and shaking, and that she directed Woody to where the cars had been parked at the time of the shooting. Woody observed a broken cell phone on the ground, "right next to where Ms. Busbee indicated that the car had been parked." Woody did not find any casings, blood, gun, or other evidence that she associated with the shooting.

{¶ 26} Voicemail messages that Martin had left on Busbee's phone the morning of the shooting were introduced into evidence. Martin's statements in these messages included the statement: "Would you answer the phone when I call you? F*** that n***** you're with. He ain't doing s*** but leaving you with a wet a**."

{¶ 27} Keeara,[2] age 16, was good friends with one of Busbee's relatives who lived at Busbee's cousin's house, and she (Keeara) was at the house for several hours the night of March 26, 2016. Keeara testified that, at a certain point, she was aware that Busbee was outside with "Mike" (Martin), who was giving Busbee money for her daughter's birthday party. Keeara then heard a gunshot, outside and close, and opened the front door because she knew Busbee was outside. Busbee rushed through the door with a couple of her children, and Keeara heard another gunshot, which sounded like it also came from the front of the house. Keeara described Busbee as "paranoid and upset," and Busbee told Keeara that Martin had fired a shot out of the sun roof of the car.

{¶ 28} A Dayton Police Department evidence technician, Ronald Christoffers, testified about the evidence he collected in the case, which included the evidence collected from Tisdale's and Martin's cars, both of which were towed to the police department. According to Christoffers, two shell casings were recovered: one in the street a short distance from Busbee's home and one on the floorboard of Martin's car. A semi-automatic pistol with one bullet remaining in the chamber was also found on the passenger seat of Martin's car. No bullet holes were found in Tisdale's vehicle or in the tire that was lost when the car hit a curb. There was a bullet hole in the passenger side windshield of Martin's car, and Christoffers's examination of the windshield indicated that

---

[2]We will avoid the use of the juvenile witness's full name.

the shot was fired from inside the car.

{¶ 29}  Martin was the only witness to testify for the defense.

{¶ 30}  Martin testified that he went to Busbee's house at about 9 p.m. on the day of the shooting.  They sat in his car while Busbee smoked a blunt, but Martin did not partake because of the poor quality of the blunt (it contained marijuana seeds). According to Martin, he did not have a sexual relationship with Busbee at that time, but he had in the past.   He knew that she had a "Lamar" tattoo (Tisdale's name) on her chest and knew of their past relationship, but Martin had never met Tisdale.

{¶ 31}  Martin testified that a Charger pulled up alongside his car with its lights off; he had not seen the car make a U-turn beforehand.   The Charger parked within 12 to 18 inches of Martin's car, such that Martin could not exit his vehicle.   The driver of the Charger then walked around the back of the two vehicles.   Martin testified that he saw a firearm in the man's hand in the driver's side mirror as the man walked behind the cars; he saw the firearm again when the man reached the passenger's side of his car, and the man (Tisdale) opened the door about a quarter of an inch.   According to Martin, Busbee was "looking around * * * anxiously," trying to lock the door, and "screaming and hollering 'he's going to kill me.' "   Martin also testified that he heard Tisdale say the words "b****" and "kill."

{¶ 32}  Martin testified that he fired at Tisdale through the sun roof with a firearm that he had beneath the armrest inside his car.   Martin believed that he had hit Tisdale, and he testified that "all aggression ceased" after the shot was fired.   Martin stated that he had been aiming for Tisdale's shoulder, but hit him in the chest because Tisdale had reached for the passenger door.   Tisdale then walked back to his car.   Martin stated that

he fired another shot into the air after Tisdale walked back to his own car, because he thought someone else was getting out of Tisdale's vehicle. Then Tisdale drove away.

{¶ 33} Martin stated that he did not follow Tisdale's car but that he did pull forward to a stop sign and, as he tried to turn right with the firearm still in his hand, it "accidental[ly] discharge[d]." According to Martin, this was the shot that went through the windshield of his car.

{¶ 34} Martin acknowledged that he had left the voicemail messages on Busbee's phone that were played at trial. He explained that he had to talk "rough" to Busbee, rather than "in an intelligent manner," to get through to her, and he pointed out that his messages had prompted her to call him back. However, Martin denied that he had a phone conversation while sitting in the car with Busbee during which he said that he "might have to shoot someone" if he went to particular clubs; he said this statement was part of Busbee's "vivid imagination."

{¶ 35} Martin acknowledged that he had not told the police officers who interviewed him on the night of the shooting that Tisdale had tried to open or had opened the door to his (Martin's) car. He explained that he had been "disoriented," "confused," and had "had a bad day."

{¶ 36} Based on this evidence, the jury found Martin guilty of the murder and felonious assault of Tisdale, discharge of a firearm on or near a prohibited premises, and improper handling of a firearm. As described above, several witnesses to the shooting testified that it was unprovoked and that Tisdale was not armed or acting in an aggressive manner when he was shot. The testimony of these witnesses, if believed by the jury, supported Martin's conviction and undercut his assertion that he had acted in self-

defense. Several witnesses also testified that Martin fired additional shots from his car after Tisdale was shot, a fact which Martin admitted (once in the air and once, he said, accidentally) in his own testimony. We cannot conclude that the jury clearly lost its way or created a manifest miscarriage of justice in convicting Martin of the offenses that it did.

{¶ 37} The third assignment of error is overruled.

### *Jury Instructions*

{¶ 38} In his first assignment of error, Martin contends that the jury instructions were incomplete, inaccurate, and misleading with respect to the "castle doctrine" and the duty to retreat before acting in self-defense. At oral argument, Martin's appellate counsel stated, somewhat more specifically, that the manner or order in which the jury instructions on self-defense were given created confusion.

{¶ 39} In Ohio, self-defense has three elements: 1) the defendant did not create the violent situation, 2) the defendant had a bona fide belief that he was in danger of death or great bodily harm and that the only way to escape was the use of force, and 3) that the defendant did not violate any duty to retreat. *State v. Williford*, 49 Ohio St.3d 247, 551 N.E.2d 1279 (1990). The castle doctrine, on which Martin's defense relied, relates to the applicability of the duty to retreat.

{¶ 40} The castle doctrine takes its name from the maxim that a person's home is his or her "castle." *State v. Waller*, 2d Dist. Clark No. 2013-CA-26, 2014-Ohio-237, ¶ 40, citing *State v. Comer,* 4th Dist. Gallia No. 10CA15, 2012-Ohio-2261, ¶ 11, and 4 Blackstone, Commentaries on the Laws of England (Rev. Ed.1979) 223, Chapter 16. The castle doctrine is now codified in R.C. 2901.09(B):

For purposes of any section of the Revised Code that sets forth a criminal

offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

**{¶ 41}** The castle doctrine does not stand for the proposition – as Martin suggests -- that he does not have the burden of proof on self-defense.[3] Rather, it sets forth circumstances in which he is not required to retreat, which relates to only one of the elements of self-defense. In other words, the castle doctrine creates a rebuttable presumption in his favor on this one element of self-defense. On the other elements – that the defendant did not create the situation that gave rise to his use of force, and that he had reasonable grounds to believe, and an honest belief, that such force as he used was necessary to protect himself – the defendant still bears the burden of proof. *See State v. Dale,* 2d Dist. Champaign No. 2012 CA 20, 2013-Ohio-2229, ¶ 18, citing *State v. Westfall,* 9th Dist. Lorain No. 10CA009825, 2011-Ohio-5011, ¶ 19 and *State v. Bushner,* 9th Dist. Summit No. 26532, 2012-Ohio-5996, ¶ 16.

---

[3]We recognize that the Eighth Appellate District has characterized the castle doctrine as "creat[ing] a rebuttable presumption" which shifts the burden of proof to the State to show that "the charged individual was not acting in self-defense." *See, e.g., State v. Kozlosky,* 195 Ohio App.3d 343, 2011-Ohio-4814, 959 N.E.2d 1097, ¶ 25 (8th Dist.). We do not agree with the breadth of this statement, as the rebuttable presumption is also dependent on additional circumstances. For example, if the victim were lawfully in a residence at the time the defendant used deadly force against him or her, the defendant would not be entitled to the presumption of self-defense. *See State v. Dale,* 2d Dist. Champaign No. 2012 CA 20, 2013-Ohio-2229, ¶ 18*,* citing *State v. Lewis,* 8th Dist. Cuyahoga No. 97211, 2012-Ohio-3684, ¶ 19.

**{¶ 42}** The trial court's instructions on self-defense extended over 5 pages of the transcript. They included, among other things, that 1) the defendant has the burden of proof on an affirmative defense, including self-defense, by the preponderance of the evidence; 2) the elements of self-defense and of the duty to retreat; 3) how to determine whether the defendant (Martin) had reasonable grounds to believe and an honest belief that he or Busbee was in imminent or immediate danger of death or great bodily harm; 4) the circumstances in which a duty to retreat no longer applies; and 5) the castle doctrine, as it applies to a vehicle. These instructions tracked the Ohio Jury Instructions on self-defense against the danger of death or great bodily harm, the test for reasonableness in self-defense or defense of another, and the presumptions related to self-defense or defense of another in a residence or vehicle (the castle doctrine). *See* 2 Ohio Jury Instructions 421.19, 421.23, and 421.24. The instructions also made clear that, even if the defendant fails to establish an affirmative defense, the State must prove all of the elements of the charged offenses beyond a reasonable doubt.

**{¶ 43}** After extensive discussions, all of the instructions that Martin requested related to the castle doctrine and defense of another were given. There were also extensive discussions about the manner in which the instructions were to be given, and defense counsel indicated his satisfaction with how these issues were resolved before the proposed instructions were given. The trial court made a diligent effort to provide and did provide all of the relevant instructions to the jury. Factual questions existed -- for the jury to decide -- about whether the facts supported the application of the castle doctrine and/or whether all of the elements of self-defense had been established; these questions necessitated a complex set of jury instructions, because the relevant

instructions were dependent on the jury's findings with respect to the circumstances surrounding the shooting. We reject Martin's argument that the court jury instructions on self-defense and the castle doctrine were incomplete, inaccurate, or misleading. Moreover, counsel did not object to the instructions that were given, and we find no plain error, as we cannot find that the jury instructions on self-defense contained any obvious defect or affected Martin's substantial rights.

{¶ 44} The first assignment of error is overruled.

### *Ineffective Assistance of Counsel*

{¶ 45} In his second assignment of error, Martin argues that he was denied the effective assistance of counsel during the cross-examination of Busbee and his own direct examination, because counsel did not ask certain questions which might have bolstered Martin's claim of self-defense. He also contends that counsel's handling of the jury instructions and of certain testimony about someone who allegedly fled from the scene of the shooting denied him the effective assistance of counsel.

{¶ 46} We review alleged instances of ineffective assistance of trial counsel under the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688.

{¶ 47} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable

probability that, but for the errors, the outcome of the case would have been different. *See id.*; *Bradley* at 142. A debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, __ N.E.3d __, ¶ 38 (2d Dist.).

**{¶ 48}** With respect to the cross-examination of Busbee, Martin asserts that counsel failed to ask more direct and specific questions about whether he (Martin) had acted to defend Busbee, and therefore failed to "fully establish" his self-defense or defense of another claim. This assertion assumes that Busbee would have answered the questions in a manner that supported Martin's theory of the case. However, Busbee had testified on direct examination that Tisdale was not acting in a threatening manner and was not armed when he approached the car. Her testimony in the State's case also did not support Martin's testimony that she had been fearful, "screaming," or "hollering" when Tisdale approached; she simply stated that she had not unlocked the door because she did not want "drama" between the two men. Defense counsel could have reasonably doubted that Busbee would answer direct questions about whether Martin had been defending her in a manner that would be helpful to the defense, and there is nothing in the record indicating that such responses were likely. As such, we cannot find that he acted ineffectively in failing to ask such questions.

**{¶ 49}** Martin also argues that defense counsel failed to "establish a key point" during Martin's direct examination: that he was acting to protect himself or Busbee. We disagree. Martin's version of events, as established through his direct examination, was that Tisdale had approached the car with a gun, that Busbee had expressed fear of

Tisdale, that Tisdale had been angry, and that Tisdale had opened the car door. This testimony supported Martin's theory of the case: that he had acted in self-defense and/or defense of Busbee. We cannot find that any additional or formulaic questions by defense counsel about whether Martin was defending himself or Busbee would have been answered in a certain fashion, were required, or would have affected the outcome of the case.

{¶ 50} Martin also contends that a particular section of the transcript during Soles's testimony created "some question" about the presence of an "unknown individual" in Tisdale's vehicle during the purchase of marijuana, who allegedly "fled" and was "never questioned by police." During the cited testimony (Tr. 289), Tisdale's brother, Soles, makes reference to a "guy named Bama," whom Soles had never met before and whose real name was unknown to him at that time. However, it is clear from the transcript as a whole that "Bama" was McMillin. McMillin testified at trial that his nickname was "Bama," that he had been with Tisdale and Soles prior to the shooting, and that they had purchased marijuana. There was nothing in Soles's testimony to suggest in any way that a person fled from the scene of the shooting and was never identified and questioned by the police. This record simply does not support any plausible argument that trial counsel acted ineffectively in failing to identify another witness.

{¶ 51} Finally, Martin contends that trial counsel was ineffective in his handling of and failure to object to the jury instructions on self-defense. As we discussed under the first assignment of error, trial counsel was very engaged with the trial court during the formulation of the jury instructions, and the instructions that were given were proper and reasonably clear. We find no ineffective assistance related to the jury instructions.

**{¶ 52}**  The second assignment of error is overruled.

***Conclusion***

**{¶ 53}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Andrew T. French
Michael Mills
Hon. Michael W. Krumholtz