[Cite as *State v. Carosiello*, 2017-Ohio-8160.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 15 CO 0017 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| NICOLAS CAROSIELLO | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS: Criminal Appeal from the Court of
Common Pleas of Columbiana County,
Ohio
Case No. 2013 CR 190

JUDGMENT: Affirmed.

APPEARANCES:
For Plaintiff-Appellee: Atty. Robert Herron
Columbiana County Prosecutor
Atty. John E. Gamble
Atty. Tammie Riley Jones
Assistant Prosecuting Attorneys
105 South Market Street
Lisbon, Ohio 44432

For Defendant-Appellant: Atty. Timothy Young
Ohio Public Defender
Atty. Francisco E. Lüttecke
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio 43215

JUDGES:
Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Stephen A. Yarbrough, of the Sixth District Court of Appeals, sitting by
assignment. (Retired)

Dated: October 5, 2017

WAITE, J.

**{¶1}** Appellant Nicolas J. Carosiello appeals an April 13, 2015 Columbiana County Common Pleas Court judgment entry finding him guilty of aggravated murder, tampering with evidence and possession of drugs. Appellant was also found guilty of the attendant firearm specifications. Appellant argues that the state failed to provide sufficient evidence to show that he acted with prior calculation and design. Additionally, Appellant argues that the state failed to rebut the presumption that he acted in accordance with the "castle doctrine." Appellant also argues that his conviction is against the manifest weight of the evidence. For the reasons that follow, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Factual and Procedural

**{¶2}** Appellant is a known drug dealer who kept large amounts of marijuana and cash inside his residence, which is located in Wellsville. (12/29/15 Trial Tr., pp. 726, 892, 965.) On August 11, 2011, four people intended to break into his house to steal his drugs and money. *Id.* at pp. 733, 896, 967. This group of would-be thieves consisted of Holly Carosiello (the victim and Appellant's estranged wife), Jamie Adkins (Holly's brother), Jordan Gainer (Holly's cousin), and Johnny Paroda (Holly's cousin). *Id.* at pp. 896-899, 767. However, when they arrived at Appellant's house, they saw people inside and left.

**{¶3}** The next morning, the group initiated a second attempt to break into Appellant's house. *Id.* at pp. 734. This time Holly was absent and the group was joined by Raymont Bryant, Tonya Sinkbeil and her niece. Jordan knocked on

Appellant's back door and entered the house. *Id.* at p. 1214. On opening the door, he encountered Appellant's mother and a large aggressive dog. Jordan identified himself as a friend of Appellant and asked if he was home. When Appellant's mother angrily ordered him out of the house, he left.

{¶4} Appellant's mother called him to tell him that someone had entered their house looking for him. Appellant phoned several acquaintances in an attempt to identify this person. Around 4:00 p.m., Johnny called Appellant and told him that Jamie, Jordan, and Raymont had been to his house to steal his drugs and money, and that they would be back. He did not tell Appellant that he was involved.

{¶5} Appellant asked Johnny to find out when the thieves planned to return. *Id.* at p. 906. Meanwhile, Appellant called his brother, Tony Carosiello, and his friend, Brian Specht, and asked them to come to the house. *Id.* at p. 742. Brian brought his girlfriend. Appellant's girlfriend, Martina Michael, was also present. Appellant hid his money and moved his drugs deep into a barn on the property. He moved all the cars to a field behind the house. *Id.* at pp. 742, 1094, 1355. Appellant's goal was to create the appearance that the house was empty. Appellant and his friends then concealed themselves in the field behind the house and waited for the thieves to arrive. *Id.* at pp. 743, 864. Appellant, who was armed with a rifle and a handgun, maintained contact with Johnny. *Id.* at pp. 749, 864, 907-909, 1279-1280. Appellant's mother and stepfather waited inside the house. The stepfather was armed with a gun.

**{¶6}** Appellant instructed Johnny to tell Jamie that he would be out of the house for a few hours and that his mother and stepfather were out of town for a funeral. Johnny continually updated Appellant as to whether and when the thieves would arrive. At some point, Appellant believed that they were not coming, and his friends left. Appellant went inside to watch television with Martina, his mother, and his stepfather.

**{¶7}** Around 9:30 p.m., Johnny called Appellant and told him that the thieves were on their way to the house after all. Appellant told Martina to call Tony and instruct him to stay away from the house, because he knew the thieves would not return if they saw Tony. *Id.* at p. 752. Tony told Appellant that a red Sunfire he believed to be Holly's, and carrying a group of people, passed his car. *Id.* at pp. 753, 1035-1036, 1098. Appellant also texted Brian and told him not to come to the house. Brian texted in reply: "[k]ill those m* * * f* * *ers." *Id.* at p. 871.

**{¶8}** Holly drove past Appellant's house and the thieves determined that the house appeared empty. This group now included Holly, her boyfriend Josh Rudder, Jamie, and Dustin Green. Jamie texted Johnny to ensure that no one was home and Johnny swore that the house was empty. *Id.* at p. 978. Josh stayed in the car and drove off, leaving Holly, Jamie, and Dustin at the house. Dustin stayed on one side of the house as a lookout. Jamie knocked on the back door. When no one answered, Jamie unsuccessfully tried to kick down the door. *Id.* at p. 980. When his efforts failed, he and Holly decided to lift her to Appellant's window, which was above the back door, so that she could climb inside the house. Jamie attempted to push in

an air conditioner unit that was sitting in the window. *Id.* at p. 983. At first, he was met with resistance. Then, suddenly, the unit slid smoothly inside the house. While this was occurring, Appellant was waiting in his room, armed with a .22 caliber pistol. *Id.* at p. 1294.

{¶9} Once the air conditioner was out of the way, Jamie lifted Holly to the window. *Id.* at p. 984. She had managed to climb partially inside when Appellant fired his gun. The shot hit Holly between her eyes. Jamie saw a flash as Holly fell out of the window and landed on a cement staircase that led to the basement. Appellant then leaned out of his window, firing his gun several times and yelling, "[y]ou robbed the wrong house." *Id.* Jamie tried to get to Holly, but when he saw the back door open, he and Dustin fled as Appellant fired into the backyard. Shortly thereafter, Martina went outside and heard Appellant say, "[o]h, my God, I shot Holly." *Id.* at p. 756.

{¶10} Martina called Tony and told him, "I think [Appellant] just shot Holly." *Id.* at p. 1100. Shortly thereafter, Tony arrived with his girlfriend Roxanne Lucas and a friend, Michael Johnston. When they arrived, Martina was crying and said, "Holly is dead." *Id.* at p. 1064. Roxanne, who is a nurse, checked Holly and told Appellant to call 911, because she thought she felt a faint pulse. *Id.* at p. 1066. Appellant told his family, "[y]ou can't tell them I shot her. Don't tell them I shot her." *Id.* at p. 761. He also tried to convince his mother and Martina to tell the police that they shot Holly. Appellant was apparently prohibited from being in possession of a gun due to a previous criminal conviction. Shortly thereafter, Tony left, and Appellant and his

stepfather began hiding the drugs and putting their guns away. At some point, Appellant's stepfather did call 911.

**{¶11}** The first responder to arrive was Officer Scott Angelo of the Ohio Department of Natural Resources. *Id.* at p. 453. He heard the call on his radio and offered to assist at the scene. He testified that Appellant and his stepfather were outside and Appellant's mother and Martina were inside the house when he arrived. He asked Martina and Appellant's mother to exit the house, since he was under the impression that an intruder may have been inside. Deputy Kevin Shulas was the next to arrive at the scene. Both Officer Angelo and Dep. Shulas testified that Appellant seemed calm and collected and that no one in the family told them that there had been a shooting. *Id.* at pp. 488, 539.

**{¶12}** Appellant initially told investigators that he had heard no gunshots during the encounter. Ultimately, he made four statements to investigators which he later admitted were untruthful. In these statements, he claimed that he saw a man in the house and he assumed that man killed Holly. However, several witnesses came forward and implicated Appellant in the shooting. One of these witnesses was his girlfriend. Sometime later, Appellant's attorney convinced him to give a truthful statement. While he admitted to Det. Allan Young that he shot Holly, he claimed to have wildly fired his shot at a "shadow."

**{¶13}** Appellant was charged with one count of aggravated murder, an unspecified felony in violation of R.C. 2903.01(A), three counts of tampering with evidence, a felony of the third degree in violation of R.C. 2921.12(A)(1), one count of

possession of drugs in violation of R.C. 2925.11(A), and three attendant firearm specifications.

**{¶14}** At trial, the state theorized that Appellant lured the would-be thieves to enter the house on the premise that it was empty, with the intent to ambush them once inside. In response, Appellant claimed that he acted in self-defense in accordance with the "castle doctrine." The jury found Appellant guilty on all counts. However, the jury found that the state had not offered adequate proof as to the amount of drugs in Appellant's possession, and his conviction for possession of drugs was reduced to a minor misdemeanor.

**{¶15}** On April 10, 2015, the trial court sentenced Appellant to life in prison without the possibility of parole for aggravated murder, 36 months of incarceration on each of the three counts of tampering with evidence, three years of incarceration on one firearm specification and one year for the other two firearm specifications. The court also ordered Appellant to pay a $150 fine and ordered that his driver's license be suspended for possession of drugs. The trial court ordered all of the sentences to run consecutively. Appellant timely appeals his convictions.

<u>"Castle Doctrine"</u>

**{¶16}** At oral argument, Appellant argued that the state cannot defeat the presumptions within the "castle doctrine" by showing that the traditional self-defense elements were not satisfied. Instead, Appellant argues that this doctrine was intended to stand alone, and that a defendant who uses deadly force to expel a person who is unlawfully in his home is always presumed to have acted in

accordance with the doctrine. Appellant urges that the only way the presumption of self-defense found in this doctrine can be defeated is by proof on the part of the state that the victim was lawfully inside the defendant's home. Appellant hinges his entire appellate brief on this presumption.

**{¶17}** Traditionally, the defense of self-defense requires a defendant to prove by a preponderance of the evidence that (1) he was not at fault in creating the situation, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the force used, and (3) he did not violate a duty to retreat or to avoid the danger. *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997); R.C. 2901.05. Although this traditional view of self-defense itself is not codified, several self-defense theories, including the "castle doctrine," are found within Chapter 2901 of the Revised Code.

**{¶18}** The "castle doctrine" is described within R.C. 2901.09(B):

For purposes of any section of the Revised Code that sets forth a criminal offense, a person who lawfully is in that person's residence has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence, and a person who lawfully is an occupant of that person's vehicle or who lawfully is an occupant in a vehicle owned by an immediate family member of the person has no duty to retreat before using force in self-defense or defense of another.

This statute, creates an exception to the third element of self-defense, the duty to retreat. *State v. Edwards*, 1st Dist. No. C-110773, 2013-Ohio-239, ¶ 6.

**{¶19}** R.C. 2901.05(B)(1) extended this doctrine:

[A] person is presumed to have acted in self defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

So while R.C. 2901.05(B)(1) must be read in context with the rest of section 2901.05 and cannot be read in a vacuum, this statute has created an additional presumption that a defendant who uses deadly force against a person unlawfully in the defendant's home is presumed to have acted in accordance with the castle doctrine. *State v. Bond*, 6th Dist. No. WD-15-070, 2016-Ohio-8383, ¶ 40.

**{¶20}** Appellant argues that the state can rebut the presumption of the "castle doctrine" only by raising evidence that the victim had a legal right to enter the defendant's residence. He maintains that his own conduct during the incident is not at issue. This argument is clearly contrary to both a plain reading of the statute as a whole and the established law in Ohio. In a Third District felonious assault case, the appellant argued that he had an absolute right to forcibly remove a person who was unlawfully on his property without regard to whether he acted within the context of the

established norms of self-defense. *State v. Hadley,* 3d Dist. No. 9-11-30, 2013-Ohio-1942. The Court explained:

> [U]nder Hadley's interpretation of the statute, the prosecution is precluded from ever rebutting the actual elements of self-defense with evidence that the defendant was not justified in using force or that the defendant used force unreasonably necessary and disproportionate to the apparent danger presented by the situation.
>
> This would mean that in every scenario in which the presumption of self-defense stated in R.C. 2901.05(B)(1) applies, the defendant is entitled to use any amount of force—even if it is unjustified or disproportionate to the apparent danger presented—against someone in his or her residence who is not privileged to be there regardless of the particular facts and circumstances of the situation. This produces an absolute license to commit any level of violence, including deadly force against any trespasser, immediately upon revoking their privilege to be there, and regardless of the circumstances. (Emphasis deleted.)

*Id.* at ¶ 58-59.

**{¶21}** The decision falls in line with decisions from other sister districts. See *State v. Montgomery*, 12th Dist. No. CA2015-03-028, 2015-Ohio-4652, 48 N.E.3d 1042, (the state can rebut the castle doctrine presumption by showing that the elements of traditional self-defense were not met); *State v. Petrone*, 5th Dist. No. 2011CA00067, 2012-Ohio-911 (recognizing that the state can rebut the castle

doctrine by showing that the defendant was at fault in creating the situation or did not have a reasonable belief that he was in imminent danger of death or great bodily harm); *State v. Kozlosky,* 195 Ohio App.3d 343, 2011-Ohio-4814, 959 N.E.2d 1097 (8th Dist.) (the state failed to rebut the castle doctrine presumption where the evidence showed that the defendant was not at fault in creating the situation and that he had a bona fide belief that he was in imminent danger of death or great bodily harm). So while the "castle doctrine" does appear to upend the usual burdens of proof, in that we start with the presumption a defendant acted in self-defense if the intruder is inside the defendant's home uninvited instead of requiring such a defendant to first prove all the elements of self-defense, this presumption does not negate those elements. Instead, the burden becomes the state's to show that the defendant's actions do not comport with the elements of self-defense. See *Montgomery*, *supra*, and *State v. Bundy*, 2012-Ohio-3934, 974 N.E.2d 139.

**{¶22}** It is apparent, then, that Appellant's attempt to remove and utilize only one portion of the more extensive self-defense statute must fail. The statute as regards the "castle doctrine" is clearly part of the self-defense body of law, and while it provides a defendant confronted with an intruder into his or her residence with somewhat greater protections under the law, this doctrine does not serve as a stand alone right to use deadly force absent other elements of self-defense. Because Appellant's assignments of error are based on his misplaced reliance on his interpretation of the doctrine's presumption, we will review these assignments accordingly.

ASSIGNMENT OF ERROR NO. 1

Nicolas Carosiello's convictions were not supported by sufficient evidence in violation of Nick's right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. April 13, 2015 Entry; T.pp. 447-1204.

{¶23} On appeal, Appellant contests only his aggravated murder conviction. Specifically, Appellant was convicted of violating R.C. 2903.01(A), which provides that: "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶24} Appellant argues that the state failed to present sufficient evidence that he acted with prior calculation and design. He contends that the record is devoid of any evidence to show that the shooting was planned or that he intended to kill Holly. At best, Appellant argues that the evidence shows that he planned to have a group of friends at his house at the same time that he expected it to be burglarized. He additionally argues that the state failed to present sufficient evidence to rebut the operation of the "castle doctrine" as he understands that doctrine.

{¶25} The state responds that the record is replete with evidence that Appellant lured the group to his house while he waited, armed, to ambush them. The state argues that Appellant and his friends waited in a field behind the house for the erstwhile thieves to arrive. The state highlights that Appellant and his friends were armed and deliberately concealed themselves. The state also points to evidence that

Appellant maintained contact with Johnny and instructed him to tell the thieves that no one was at home. The state presented testimony that Appellant said that if the group of thieves arrived, he would shoot them. Further, Appellant instructed others to stay away from the house because he knew the thieves would not attempt to enter if they thought someone was home.

{¶26} "Sufficiency of the evidence is a legal question dealing with adequacy." *State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 49 (7th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.3d 541 (1997). "Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Draper*, 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶ 14, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). When reviewing a conviction for sufficiency of the evidence, a reviewing court does not determine "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Rucci*, 7th Dist. No. 13 MA 34, 2015-Ohio-1882, ¶ 14, citing *State v. Merritt*, 7th Dist. No. 09-JE-26, 2011-Ohio-1468, ¶ 34.

{¶27} In reviewing a sufficiency of the evidence argument, the evidence and all rational inferences are evaluated in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on the grounds of sufficiency unless the reviewing court determines no

rational juror could have found the elements of the offense proven beyond a reasonable doubt. *Id.*

**{¶28}** The state argues that sufficiency of the evidence is not the proper standard of review when dealing with the "castle doctrine." Citing *State v. Meisel,* 7th Dist. No. 10 MO 4, 2011-Ohio-6426, the state explains that a manifest weight of the evidence standard is more appropriate, as a defendant claiming self-defense does not seek to negate an element of the offense, but instead seeks to relieve himself of culpability. See also *State v. Hogg,* 10th Dist. No. 11AP-50, 2011-Ohio-6454 (because the "castle doctrine" involves an affirmative defense, a manifest weight of the evidence review is more appropriate than a sufficiency of the evidence review).

**{¶29}** While the state is correct, we note that the evidence the state used to show that Appellant did not act in self-defense is the same evidence it used to show that he acted with prior calculation and design. Thus, a finding of prior calculation and design necessarily negates the Appellant's reliance on self-defense.

**{¶30}** The legislature intended the element of "prior calculation and design" to require more than mere instantaneous or momentary deliberation. *State v. Kerr,* 7th Dist. No. 15 MA 0083, 2016-Ohio-8479, ¶ 20. Prior calculation requires evidence "of 'a scheme designed to implement the calculated design to kill' and 'more than the few moments of deliberation permitted in common law interpretations of the former murder statute." *Id.*

**{¶31}** When evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior

calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *Id.*, citing *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 61.

**{¶32}** An appeal contesting a finding of prior calculation and design is evaluated by looking at the totality of the circumstances on a case-by-case basis. *Kerr* at ¶ 21. Prior calculation and design can be found where a defendant "quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001), citing *State v. Palmer*, 80 Ohio St.3d 543, 567-568, 687 N.E.2d 685 (1997).

**{¶33}** Instead of a bright-line test, Ohio courts analyze several factors to determine if prior calculation and design has been proven. These factors include whether the defendant and victim knew each other, if the relationship was strained, whether the defendant gave thought in choosing the murder weapon or site, and whether the act was drawn out or sprung from an instantaneous eruption of events. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 56-60.

**{¶34}** Neither party disputes that Appellant and Holly knew one another. They were married and had two young children together. The parties also do not dispute that the relationship was strained. Although they were still married, they had been separated for a year and each were both dating other people. The record also contains evidence that there was some animosity between them.

**{¶35}** There is no direct evidence that Appellant "chose" the murder site. It was Holly and her group who had decided to invade Appellant's house. However, despite being made aware that this group intended to burglarize his house, Appellant made no attempt to alert the police. Instead, Appellant went to great effort to make the house appear entirely empty in order to entice the group to return to his home, where he could control the chain of events as they occurred. Appellant directed Johnny to tell Jamie that his house would be empty that night. He moved all the cars to a field behind the house. It is apparent from this record that Appellant lured the group to his house while he waited, armed. In effect, he ensured that his house would be the murder site. He also deliberately armed himself with a .22 caliber handgun after learning the group was on their way.

**{¶36}** As to whether the act was drawn out or instantaneously erupted, the trial court noted that substantial evidence was provided to the jury to demonstrate that the act was drawn out and was not the result of an instantaneous eruption of events:

> The Defendant was in his own home at the time of the offense, but the evidence of prior calculation and design is overwhelming. The Defendant engaged in a comprehensive plan to set up the killing and to then carry it out. An integral part of the plan included causing others to believe that the Defendant's house was empty because they would not enter an occupied house. Holly Cariosello [sic] was lead [sic] to believe she was entering an empty house. In fact the Defendant was armed

and waiting inside. Ultimately, Holly Cariosello [sic] was shot one time through the forehead literally right between her eyes. This fact contradicts the Defendant's version of the events.

(4/13/15 Sentencing Entry, p. 2.)

**{¶37}** The state's case relied on the testimony of several witness, phone records, a series of police interviews, and physical evidence. This evidence shows that Appellant put together a plan where his intent was to kill and that he went to a great deal of effort to ensure its success.

*Enticement*

**{¶38}** The state relied heavily on the fact the Appellant knew that the thieves would not attempt to enter the house if they believed it was occupied. This is evident from the fact that the group abandoned their first two attempts after observing people inside the house. Knowing this, Appellant deliberately created the appearance that the house was empty.

**{¶39}** One of the state's key witnesses was Martina Michael. Martina testified that after Appellant learned of the group's plans, Appellant moved the drugs towards the back of a barn and hid his money. (12/29/15 Trial Tr., p. 742.) He also moved all the cars on the property to a field behind the house.

**{¶40}** Tony corroborated Martina's testimony that Appellant moved all the cars to the field. *Id.* at p. 1094. Tony also testified that Appellant intended to make the house appear to be empty. Stephanie DeRoss testified that Appellant had the phone on speaker, and that she overheard his conversations with Johnny. She

specifically heard Appellant tell Johnny to inform the group of thieves that he would be out of the house for a few hours and that his mother and stepfather were out of town for a funeral.

**{¶41}** In addition to his efforts to make the house appear empty, several witnesses testified that Appellant later directed Tony and Brian not to return to the house because he knew the thieves would only return if they believed no one was home. *Id.* at pp. 752, 871, 1098. Martina testified that Appellant instructed her to call Tony and tell him not to come near the house. Tony confirmed that he received this call as he was driving near the house. After receiving Martina's call, he pulled off to the side of the road and waited for further instructions. At one point, he saw a car that he believed was Holly's, and he phoned Appellant with the news that she had just passed him. *Id.* at p. 1098. Roxanne Lucas, Tony's girlfriend, confirmed Tony's testimony, as did Michael Johnston, a friend of Tony's who was also in the car. *Id.* at p. 1035.

**{¶42}** Stephanie testified that Appellant texted Brian and told him that the thieves were on their way to his house and that Brian should stay away. Brian responded to Appellant: "Kill those m* * * f* * *ers." *Id.* at p. 871. Stephanie saw both texts.

**{¶43}** It is clear from this record that Appellant took great effort to not only lead the would-be thieves to believe that the house was empty, but also to ensure that no one would come to the house and scare them away. There is substantial evidence of record that Appellant lured them to his house.

*Weapons*

**{¶44}** Martina testified that Appellant was armed with two guns, a rifle and a .22 caliber handgun. *Id.* at pp. 748, 864, 1092. This was corroborated by Tony, Stephanie, and Appellant himself. At the time Holly and her group arrived, Appellant admits that he was armed with the .22 caliber handgun. According to Martina and Appellant's testimony, his stepfather was also armed. There is no evidence that any member of the group of thieves was armed or that Appellant had any reason to believe that they were. While Appellant testified that Johnny told him the thieves were trying to find a gun, Johnny denied this assertion.

*Ambush*

**{¶45}** Multiple witnesses testified that Appellant and his friends concealed themselves in the field behind the house as they waited for the group to arrive during the afternoon. Appellant concedes that he was armed with multiple weapons at this time. Appellant maintained contact with Johnny while they waited, to ensure they would be prepared to act when the thieves arrived.

**{¶46}** There is also evidence that Appellant actively assisted the thieves to effect the ambush that night. Jamie testified that he could not kick down the back door, so he and Holly decided that he would lift her to the window for her to climb through. He testified that he attempted to push in an air conditioner unit that blocked the window. At first, he met resistance. Suddenly, the unit slid easily inside without a crash. *Id.* at p. 983. Police found the unit sitting on a plastic tote to the right of the window. There did not appear to be any damage to a variety of items underneath the

window, where the unit would have fallen.  The state theorized that Appellant realized that Jamie could not push the unit inside because the entertainment center blocked the window, so Appellant pulled the unit inside as Jamie pushed, in order to aid the thieves' entrance into the room.

**{¶47}** Det. Young testified that it appeared as if someone had lifted the air conditioner unit out of the window and placed it on the totes.  *Id.* at p. 584.  A wooden entertainment center stood directly in front of the window and was about an inch or so higher than the windowsill.  Det. Young opined that this would have made it extremely difficult to push the unit through window.  *Id.* at p. 586.  Det. Young surmised that this is why Jamie's efforts were initially met with resistance.

**{¶48}** When investigators arrived at the scene, they observed several glass bottles and various items that stood upright on the entertainment center along with an undisturbed large flat screen television.  Det. Young testified that it would have been impossible for the air conditioner unit to be pushed inside without knocking over the television set or any of the glass bottles or various items that stood on the entertainment center.

**{¶49}** Additionally, the unit was found lying on a plastic tote with the side that would have been outside of the house face down on the tote.  The side that would have remained in the room was facing the ceiling.  This positioning would have required the unit to flip over while in the air and coincidentally land directly on the tote to the right of the window.  Based on this evidence, the state contended that Appellant assisted in the removal of the unit and then waited, with his gun aimed at

the window, while Holly climbed through. In fact, Appellant admits that he waited in his room, armed, while Holly climbed through the window. *Id.* at p. 1294.

**{¶50}** At trial, the state's position was that the testimony of Krista Timm, deputy medical examiner, did not support Appellant's claim that he had been crouched down, and then jumped up and shot wildly at a shadow in the window. She testified there was a single gunshot wound directly between the victim's eyes. *Id.* at p. 1176. In addition, Jamie testified that he and Holly had been talking in a normal tone of voice, as they did not believe anyone was home. It was likely that Appellant, who was inside the small bedroom above the back door, could hear their plans to push the air conditioner through the window so that Holly could climb inside the room. Hence, the evidence shows that Appellant aided the victim's entrance into the house and was waiting there, poised to shoot.

**{¶51}** Considering the facts and circumstance of this case, there is substantial evidence that Appellant acted with prior calculation and design. Although the evidence is largely circumstantial, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Prieto*, 7th Dist. No. 15 MA 0200, 2016-Ohio-8480, ¶ 34, citing *In re Washington*, 81 Ohio St.3d 337, 340, 691 N.E.2d 285 (1998); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. In fact, "[e]vidence supporting the verdict may be found solely through circumstantial evidence." *State v. Smith*, 7th Dist. No. 06 BE 22, 2008-Ohio-1670, ¶ 49.

**{¶52}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

<u>ASSIGNMENT OF ERROR NO. 2</u>

Nicolas Carosiello's conviction for aggravated murder was against the manifest weight of the evidence, in violation of Nick's right to due process of law under the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. April 13, 2015 Entry, T.pp. 447-1595.

**{¶53}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *Thompkins*, 78 Ohio St.3d at 387. It does not revolve around a question of mathematics, but depends on the effect of the evidence in inducing belief. *Id.* Weight of the evidence involves the state's burden of persuasion. *Id.* at 390 (Cook, J. concurring). On review, the appellate court looks at the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins* at 387. This discretionary power is to be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶54} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in best position to weigh the evidence and judge the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶55} The jurors are free to believe some, all, or none of each witness' testimony and they may separate the credible parts of the testimony from the incredible parts. *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 42, citing *State v. Mastel*, 26 Ohio St.2d 170, 176, 270 20 N.E.2d 650 (1971). As such, when there are conflicting versions of events, neither of which is unbelievable, a reviewing court will not choose which one is more credible. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

{¶56} Appellant essentially repeats his arguments from his first assignment of error. As previously discussed, the appropriate review when looking at a matter involving the "castle doctrine" is manifest weight of the evidence. Appellant believes that a defendant who asserts the "castle doctrine" defense is never subject to the elements of traditional self-defense. He urges that this doctrine was intended to stand alone and that a defendant who uses deadly force to expel a person who is unlawfully in his home is always presumed to have acted in accordance with the "castle doctrine" and should automatically be exonerated. Appellant urges that the

defendant's behavior is never properly at issue once that defendant involves the "castle doctrine."

**{¶57}** As previously stated, the "castle doctrine" provides that a defendant acts in self-defense when defensive force is used against a person who is unlawfully in his home. *Bond, supra,* at ¶ 40. It removes a defendant's duty to retreat. *Montgomery, supra,* at ¶ 16. However, it will not apply to provide a defense when there is evidence that the defendant was at fault in creating the situation or that he did not have a reasonable belief that he was in imminent danger of death or great bodily harm. *Montgomery, supra,* at ¶ 15.

**{¶58}** Witness testimony was an integral part of this case. The state presented several key eyewitnesses, including: Martina Michael, Johnny Paroda, Jamie Adkins, Tony Carosiello, Roxanne Lucas, Michael Johnston, and Stephanie DeRoss. The defense presented testimony from Jordan Gainer, Josh Rudder, Dustin Green, and Appellant. At the onset, we acknowledge that there were at least some credibility issues.

**{¶59}** Martina Michael admitted that after the incident she drove Appellant to a secluded area called "Coal Hollow" where he ripped up a box containing ammunition for the murder weapon and disposed of it, along with bullets and a gun. She admitted that she pleaded guilty to obstruction of justice and tampering with evidence and was sentenced to two years in prison and five years of probation for these actions. Thus, the jury was informed of her role in the incident and of her plea agreement. Although she initially lied on Appellant's behalf in her first statement to

police, she later called the sheriff's office, gave a truthful statement, and showed investigators where Appellant disposed of the evidence.

{¶60} In addition to her testimony about the guns and ammunition, she testified to other important aspects of the incident itself. She stated that after Appellant learned that the thieves were on their way to the house, he instructed her to call Tony and tell him to stay away. Appellant told her and his family that they could not tell the police that he shot Holly, and he tried to convince her and his mother to tell the police that they shot Holly. Her testimony in this case was corroborated by several witnesses.

{¶61} Johnny Paroda informed the jury that he had a role in the events related to the shooting and, as a result, had pleaded guilty to involuntary manslaughter, obstruction of justice, and conspiracy to commit burglary. He told them he was sentenced to eight years of incarceration. He admitted that he sold drugs for Appellant. He informed the jury that he was involved in the first two burglary attempts, but that he later joined with Appellant and helped orchestrate the events that lead up to the killing. Specifically, he testified that he told Jamie the house would be empty that night, at the request of Appellant. He testified that he remained in contact with Appellant throughout the night and informed him when the group was on their way to his house. His testimony was largely corroborated by phone records introduced during Det. Jeffrey Haugh's testimony and Stephanie DeRoss' testimony.

{¶62} Jamie Adkins also admitted his role in planning to burglarize Appellant's house. He disclosed that he pleaded guilty to manslaughter, burglary, and

conspiracy to commit burglary and was sentenced to ten years in prison. He admitted that while he sold drugs for Appellant, he was involved in each of the three burglary attempts. Jamie testified that Johnny swore to him that no one would be home that night. Jamie also provided testimony to support Det. Young's theory that Appellant assisted in removing the air conditioning unit from the window to allow Holly to climb inside the room. He also testified that Appellant continued to fire his gun into the backyard after shooting Holly while he and Dustin ran away.

{¶63} Tony Carosiello testified that he had pleaded guilty to three counts of tampering with evidence and was sentenced to two years in prison for his role in the incident. The charges stemmed from his actions in disposing or attempting to dispose of two guns (including the murder weapon), and a bag of marijuana. He testified that he threw the murder weapon into the Ohio River, but that Appellant retrieved a second gun and the marijuana from Tony before they could be destroyed. Tony also provided testimony regarding the events that took place on the day of the shooting. Tony testified that during that afternoon, Appellant moved cars on the property to the back field to make it appear as if no one was there. He stated that Appellant deliberately concealed himself in the field, armed with a handgun and a rifle. He also corroborated Martina's testimony that Appellant told him to avoid the house after learning the group was on their way. His testimony was corroborated by Martina and Roxanne Lucas.

{¶64} The state did not file charges against Roxanne Lucas. While she admittedly waited in the field with Appellant and saw Holly's body after the shooting,

she was not actively involved in planning or carrying out the crime. She testified that she checked Holly after arriving at the house, because she is a nurse. She thought she felt a weak pulse and told Appellant to call 911. She then got in her car and waited for Tony because she wanted no further involvement with the matter.

{¶65} Michael Johnston was an eyewitness. He testified that he was in the car with Tony and Roxanne when Tony saw Holly's car. He said that Appellant or Martina called Tony and, shortly thereafter, Holly arrived at Appellant's house. He later saw Holly's body and heard Appellant ask his family to lie about the shooting.

{¶66} Stephanie DeRoss testified that she went to Appellant's house the afternoon of August 12th with Brian Specht. She testified that she followed the group to the field behind the house, but did not immediately understand the situation. She testified that Appellant maintained contact with Johnny while they waited in the field. At one point, Appellant had the phone on speaker and she heard him instruct Johnny to tell the group of thieves that the house would be empty. She also heard the men say that Holly was the getaway driver.

{¶67} Jordan Gainer testified that, at the time of trial, he was incarcerated for possession of cocaine, however, it is unclear whether his criminal charges arose from this case. He testified about prior failed attempts to burglarize Appellant's house, on August 11th and the morning of August 12th. He was not involved in the attempt that resulted in Holly's death.

{¶68} Josh Rudder testified that he pleaded guilty to complicity to burglary and was sentenced to five years of incarceration as a result of this matter. He also

testified that he was under the influence of drugs during the incident in question. His role was to drop the thieves at Appellant's house and drive around until the group called him to pick them up. He testified that once he learned that the plan had gone awry he did not return to the house.

{¶69} Dustin Green testified that due to this incident he pleaded guilty to conspiracy and complicity to commit burglary and was sentenced to six years of incarceration. His testimony corroborated Jamie, Johnny, and Jordan's testimony as to the events of that night.

{¶70} The final witness to testify was Appellant. Appellant had significant credibility issues. First, he admittedly gave at least four untruthful statements to investigators. He conceded that his final statement was made only after several witnesses came forward and implicated him. Appellant claims that he lied because he was afraid that the police were "out to get [him]." *Id.* at p. 1304. He stated that he feared if he told investigators the truth, "they were going to just slap the cuffs on me, and I was never going to get out of jail." *Id.*

{¶71} His testimony also substantially contradicted that of almost every other witness. For instance, Appellant testified that he was not a drug dealer. Instead, he explained that when he would buy marijuana for his own personal use he would often buy more than he needed in case a friend wanted to purchase some to smoke with him. This testimony contradicted that of every witness. He also testified that he was unaware that the thieves were after his drugs and money. This testimony contradicted the testimony of several witnesses.

**{¶72}** Appellant claimed that he did not lure the group to his house for purposes of an ambush. He wanted the group to return so that he could catch them in the act and take the evidence to the police. *Id.* at p. 1280. He admitted that he moved all the cars on the property to the field in an effort to make the house appear to be empty. *Id.* at p. 1355. He also admitted that he told investigators that he was lying in the grass to conceal himself and that he was armed with a .22 caliber handgun and a rifle. *Id.* at p. 1282.

**{¶73}** On the night of August 12th, Appellant says he told Martina to call 911 after learning the thieves were nearby. However, Martina testified that Appellant instructed her to call Tony. Appellant later conceded that he knew Martina called Tony, not 911. Appellant testified that he told Tony and Brian to come to the house when he learned that the thieves were on their way. However, Tony and Martina testified that Appellant instructed Tony and Brian to stay away from the house. Stephanie testified that she saw a text from Appellant to Brian telling him that the thieves were on their way and not to come to the house.

**{¶74}** After the thieves arrived, Appellant said that he heard noises that sounded like they were trying to kick down the back door. He testified that he went to his bedroom because he believed it was the best way to defend the back of the house. He claimed that he crouched down by his bedroom door, and could not see the air conditioning unit or the window from his position because the television set obstructed his view. He testified that the air conditioning unit suddenly flew into the room and hit the television set, causing it to swivel. He claimed that the unit rolled to

the side and landed on the plastic tote. This contradicts the testimony of the investigators and the photographs taken at the scene.

{¶75} Appellant told investigators that the intruder was "inside the window up to their waist or hips." *Id.* at p. 1381. He attempted to clarify that statement by saying he believed the person's hips had cleared the window because items had been knocked off the entertainment center. *Id.* However, when investigators arrived, they noted that the items on the entertainment center appeared to be undisturbed.

{¶76} He asserted that he saw a shadow at the window and that he jumped up and fired a shot "wildly" into the direction of the shadow as he ran out of the room. This appears to contradict the deputy medical examiner's testimony that the victim was shot directly between her eyes, as it seems unlikely that Appellant could jump up and fire a wild shot that landed perfectly between the victim's eyes.

{¶77} Appellant also testified that he ran out of the room after firing the shot. When the state reminded him that he admitted to firing "warning shots" out of the window, he said that he realized after leaving the room that someone might still be outside so he ran back inside the room and fired the shots out the window before again leaving the room, in contradiction to his previous statement to investigators. *Id.* at p. 1385.

{¶78} He claimed that he did not go out the back door immediately, but did go outside when he decided that he needed evidence that someone had broken into the house. He only realized that Holly had been shot when he went outside to see if there was a broken window that he could use as such evidence.

{¶79} Appellant admitted that he asked his family not to tell anyone that he shot Holly because he did not want his children to grow up knowing that he killed their mother. He explained,

I didn't want it to be in the front page of the paper as the guy that killed his wife. * * * I didn't want to face the facts. I mean, it was just - - I felt like my life was over. I felt - - I didn't know what my rights were. I didn't know that - - you know, I didn't know - - all I know is that I was put in a position where I felt like I had to defend myself, and now I felt like the cops aren't going to believe what I have to say. They're - - you know, I'm going to go to prison for this.

*Id.* at p. 1300.

{¶80} Appellant testified that Tony came to the house after the shooting and took the murder weapon from him. When he asked Tony the next morning about the gun, Tony showed it to him. Realizing that it was not the murder weapon, Appellant took it back. He then gave the murder weapon to Tony and said, "I don't want the gun." *Id.* at p. 1309. When asked about the conflict between his testimony and Tony's he explained that Tony was "going to do what he has to do to keep himself out of jail." *Id.* at p. 1399. However, Appellant later admitted he told Det. Young that he asked Tony to get rid of the gun. *Id.* at p. 1405.

{¶81} Appellant also admitted that he disposed of the ammunition and a third gun. He claimed that he did so because he did not want guns around the house

anymore. He did not explain why he went out of his way to leave the items at a remote location or why he ripped up the box that held the ammunition.

**{¶82}** Appellant claimed that he did not call Johnny the evening of the incident. When the state reminded him about Det. Haugh's testimony regarding phone records showing calls were placed from Appellant to Johnny that night, Appellant opined that the detective did not understand how to read phone records.

**{¶83}** Appellant's version of the facts is not in accord with any of the other witnesses' testimony or with the physical evidence, consisting of phone records and photographs. All of the other witnesses corroborated, in the main, one another's version of the events. There is nothing within the record to show that any of these witnesses' testimony was incredible, with the exception of Appellant's. Again, the jury was in the best position to judge all of the witnesses' credibility.

**{¶84}** To rebut Appellant's reliance on the "castle doctrine," the state needed to show that the elements of traditional self-defense were not met. The first element of traditional self-defense looks to whether the defendant was at fault in causing the incident. The record is replete with evidence that Appellant lured the group to the house and enticed them to enter it. While it is true that the group planned to burglarize Appellant's house, it is clear from these facts that he deliberately turned the tables on them after learning of their plans. He instructed Johnny Paroda to tell the group that no one would be home. Appellant does not dispute the fact that he made the house appear to be empty. There is also testimony from multiple witnesses that Appellant told his brother and friend to avoid the house so as not to

scare the group away. Additionally, there is testimony and photographs that strongly suggest that Appellant assisted Jamie in removing the air conditioning unit out of the window so that Holly could climb through. Importantly, at no time did Appellant attempt to call the police. Instead, he chose to take matters into his own hands.

{¶85} The second element of traditional self-defense is whether the defendant held a *bona fide* belief that he was in danger of death or great bodily harm. Here, it is clear that Appellant did not believe that he was in danger. While Appellant claimed that Johnny told him the group was looking for a gun, Johnny did not corroborate this testimony. There is no other evidence to suggest that Appellant had reason to believe that the group would be armed. It is clear from these facts that Appellant acted to protect his possessions, drugs and money, and not himself. It is equally clear that he acted out of anger, not fear. He wanted to send a message to a group of people that he admittedly did not like. As such, there is competent, credible evidence to show that Appellant did not act in self-defense. For the same reasons, the jury's finding of prior calculation and design is also supported by competent and credible evidence.

{¶86} Accordingly, Appellant's second assignment of error is without merit and is overruled.

## Conclusion

{¶87} Appellant argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. This record provides substantial evidence to support Appellant's convictions. Further, this record

demonstrates that witnesses, except for Appellant, were largely credible. As such, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Yarbrough, J., concurs.